## McCONNELL vs. HARDEMAN.

In an action of trespass to personal property, it is necessary that the plaintiff aver that the property, for the taking or injury to which the action is brought, is of some value.

The statutory enactments in this State, in relation to the liability of the master for the tortious acts of his slaves, are modifications of the general law, which does not hold the master liable unless such acts were done by his orders, or with his privity, or were sanctioned by him: and, therefore, the liability of the master, for acts of his slaves, in which he did not participate, must be restricted to those trespasses which are indictable offences, or, not being so, are specified in the statute.

*Error to Johnson Circuit Court.*

The Hon. A. B. GREENWOOD, Circuit Judge.

BATSON, for the plaintiff.

FOWLER, for the defendant. Unless the master actually command or consent to the trespass committed by his servant or slave, an action of trespass cannot be maintained therefor against him. 1 *Ch. Pl.* (*Ed. of* 1809) 182; *Johnson vs. Castleman,* 2 *Dana R.* 378; *Middleton vs. Fowler,* 1 *Salk. Rep.* 182; *Puryear vs. Thompson,* 5 *Humph. Rep.* 399; *Wright vs. Weatherby,* 7 *Yerg.* 378; *Church vs. Mansfield,* 20 *Conn. Rep.* 287.

The second and third counts, each fail to allege that the horse was of any value; which is a fatal defect. See 1 *Esp. N. P* (*N. York Ed. of* 1811) *p.* 407; 1 *Ch. Pl.* (*Ed. of* 1808) 363; *Stephen on Pl.* 347.

Mr. Chief Justice WATKINS delivered the opinion of the Court. The plaintiff in error sued the defendant in trespass, for the tortious act of his slave in taking the plaintiff's horse. The case

went off in the Court below upon demurrer to the declaration, which was adjudged insufficient. The second count does not vary materially from the first in setting out the cause of action. The third charges the trespass to have been committed by the defendant in person. But these two counts are defective in failing to describe the property other than as the plaintiff's horse, containing no averment that it was of any value, or any reference to such description in the first count. The substantial allegation in the good count is, that a certain slave, owned by the defendant and in his possession, seized, took, and rode off a certain horse belonging to the plaintiff. Considering the gravamen of the action to be for a trespass committed by the slave without the command or license of his master, a question of much interest in a slaveholding community, has to be determined.

It is quite apparent that there is but little similarity in the relation of master and slave, and that of master and servant, at the common law. The slave is property, and though, for some purposes, treated as a person, amenable to the law, and, at the same time, entitled to its protection for offences committed by or against him, the dominion of the master is absolute, except so far as it may be restrained or regulated by statute. The duty of the slave is obedience. His services and his acquisitions belong to the master, and in return for this, the duty of the master is to support and provide for the wants of the slave in sickness or in health, and to protect him against all unlawful violence or injury. Negro slavery is a domestic institution, no further controlled by statutory enactments than has been thought necessary by the Legislature, to ameliorate the condition of the slave and preserve the peace and good order of society. It is not founded in any contract between the master and the slave; and while the *status* or condition of the slave continues, no valid contract can be made between them. If the slave be injured by third persons, the redress by action is in the master, nor can the slave become civilly liable for injuries done by him to the master or to third persons.

On the other hand, at the common law, the servant, though a

menial, has civil, and may have political rights; his service begins, continues, and terminates in contract with the employer. Though necessity may often be a powerful incentive to obedience, he owes no duty beyond the obligation of complying with his agreement for service. The acquisitions of the hireling are his own, and though a recovery against him at law might be fruitless, the theory is, that he is not otherwise responsible for the private injury resulting from his torts or breaches of contract. The master is not responsible for the wilful or malicious trespass of the servant, to whom alone the injured party must look for redress. The liability of the master for the misconduct or negligence of the servant, while engaged in his employment, implies a corresponding liability on the part of the servant to the master for the consequences of his fault. The loss of service and character may also be checks upon persons of this class, ensuring their fidelity and good behavior.

On first impression of these broad distinctions, it would seem that the master ought to be liable to make reparation in damages to the person injured by the trespass of his slave. It was so according to the civil law, to which the institution of slavery as it exists in some of the American States, is very nearly assimilated. And yet, with the exception of Louisiana, such has not been the course of decisions in this country. It may be that the earlier decisions on this subject, where the common law system of pleading had been adopted, were influenced more by the form than the substance of the remedy, following a rule of law founded on reasons which have but little application to cases of this description. Of course, where the master commands or approves the trespass of his slave, it becomes his own act, and he may be sued for it, as if committed by himself. But the question is concerning those acts of the slave, which are done or omitted without the authority of the master, or even against his orders. In *Snee vs. Trice*, (2 *Bay*, 345), decided in South Carolina, in 1802, the extreme ground was taken that a master was not liable for the unauthorized acts of his negroes, though engaged in his

20BB

service or employment at the time, or for any act of theirs injurious to others, if done without his knowledge or approbation, though it was admitted that in all cases, in the way of trade or any public employment, or where a confidence is held out to the public, the master would be liable in damages to the party injured by the negligence or misconduct of the slave. As may be supposed for example, a negro black-smith who shoes a horse so negligently as to lame him, the master would be liable to the customer for his slave's want of skill. So a slave ferryman, or carrier, when allowed by the master to act in that capacity, (3 *McCord* 400.) The Court, in *Snee vs. Trice*, argued that slaves in Carolina being in general a headstrong, stubborn race of people, who had a volition of their own, and the physical power of doing great injury to neighbors and others, without the possibility of their masters having any control over them, especially when absent from them, it would be a most dangerous thing to make their masters liable for their unauthorized acts to the extent of the common law, where masters are liable for the neglects of their servants. In other words, as the counsel argued, such a doctrine would place every master in Carolina in the power of his slaves, who might, by their misconduct, ruin him, whenever they pleased to combine together for that purpose. The Court said: "Other salutary checks have been found by experience, more efficacious than that of recovering damages from the master." We are not told what those checks were, but they must have consisted in corporal punishments, which could not well be more severe or efficacious, if inflicted in pursuance of some sentence of law, than if administered by the master himself in the way of correction. The difficulty is, that the punishment of the slave in either mode, and the master might be indifferent to the mode, produced no compensation to the person injured by the trespass of the slave. The more recent case of *Parham vs. Blackwelder*, (8 *Iredell* 446,) is the best reasoned one we have met with, in support of the rule established in South Carolina. There, a slave of the defendant went with his master's wagon and team to the land

of the plaintiff, and cut and hauled away a load of wood, and carried it to the defendant's yard, for which the plaintiff brought trespass.    RUFFIN, C. J., took the broad ground that, although the slave was in his master's employment, the master would not be liable if the servant wilfully committed the act; that is, without the direction of the master.    That, he says, " is the true criterion of the master's responsibility; whether he was or was not the cause of the trespass by expressly ordering it, or subsequently sanctioning it; and not whether the person injured can or cannot have an action against the servant.    If it turned on the latter ground, the owner would be liable, though he were present forbidding the servant, and doing all he could to prevent him from doing the wrong.    In fine, it would bind the master to answer in damages for all the acts of a bad negro, upon the presumption of an authority to commit them; a presumption, which, as it seems to us, cannot be drawn from the relation of master and servant, in reference to one kind of servant more than to another.    It is the misfortune of one, who is injured in his person or property by another, that he cannot obtain adequate pecuniary satisfaction; but the misfortune is not greater when the wrong-doer is a slave, than when he is any one else who has no property.    That he is not able, in either case, to have such redress against the perpetrator of the wrong, affords no reason why he should recover from one who is as innocent as himself."    Such is the conclusion of the Court in that case, and though we might suppose it to be based upon a fundamental error in regard to the nature of negro slavery, there are two considerations urged in support of it, one of which is certainly entitled to much weight.    The Court say, that for the very reason that slaves are not liable for damages, our law renders them summarily punishable corporeally, in many instances in which free persons are not indictable; though that might be to some extent a consequence of the rule, rather than a reason for its adoption.    But it was urged that the liability of the master, for any trespasses of his slaves not sanctioned by him, would render it necessary to his own preservation from ruin," to

keep them up, as he does his beasts, to prevent their going on the premises of another; "a doctrine," Judge RUFFIN said, "as abhorrent to the feelings as it is contrary to the usages of the country."

In Tennessee, the master is not liable for the trespass of his slave, unless he was privy to, or participated in, the act, and this, whether the slave be regarded as property only, or as a servant at the common law. (*Wright vs. Weatherly*, 7 *Yerg*. 367.) Upon the authority of this case, and that of *Snee vs. Trice*, the Court of Errors in Mississippi, in *Leggett vs. Simmons*, (7 *Smedes & Marsh*. 348,) held, though in a very doubtful and hesitating manner, that the civil liability of the master for the felonious killing, by his slave, of the slave of another, depended upon the criminal knowledge or agency of the master in the transaction. In the interesting case of *Brandon vs. The Huntsville Bank*, (1 *Stew*. 320,) where the plaintiff's slave found a roll of bank notes, which a stranger took from him and deposited in a bank for safe keeping, and the true owner not appearing, the plaintiff brought trover against the bank for the notes, Judge SAFFOLD was of opinion that because the money, when found by the slave, became the acquisition of the master, and he was entitled to recover it against all the world but the true owner, it did not follow that the master would have been liable to the owner, in case the slave, after finding the money, had wasted, concealed, or wantonly destroyed it, without his master's consent or privity. He thought that, in this country, in order to create responsibility on the master, "the slave must, at the time, be in his immediate employment, or from his vicious habits and general liberty, some degree of culpability must attach to the master to make him responsible." See also *Cauthon vs. Deas*, (2 *Port*. 276.) Without pursuing this examination further, it may be said that, at every turn, we find these questions complicated in the frame-work of society, by peculiar considerations, not referable to the common law, or governed by its analogies. For instances of this, may be cited

*Scuddar vs. Woodbridge,* (1 *Kelly* 195,) and *Neal vs. Farmer,* 9 *Georgia* 555.

Our statutory provisions, affecting masters' liability, are in imitation of the civil law, though essentially differing from it. Under the title, *Criminal Law,* a variety of trespasses are made indictable, such as killing, maiming, or administering poison to domestic animals; and, in like manner, many kinds of trespasses on real estate are specified. In the same title, under the head of *Slaves,* the statute provides that "masters of slaves in this State shall be held responsible for the full amount of single damages and costs of the trespass of his slaves, and any person injured by the trespass of any slave shall have his action against the master for the damage he may have sustained by such slave." And in *all trespasses and offences less than felony,* committed by any slave, on the person or property of another, the master may compound with the injured person and punish his own slave, without the intervention of any legal trial or proceeding; but if he refuse to compound, the slave may be tried and punished, and the damages recovered by suit against the master. Under the head of *Trespasses,* where civil remedies are provided for specified injuries to land, fences, growing crops, and the like, the person trespassing is made liable to pay double, and, in some instances, treble damages. Section 5 enacts that, "if a slave commit any of the trespasses *mentioned in the first two sections* of this act, the party injured may bring his action against the master, owner (or hirer for the time being) of such slave, for the recovery of single damages," &c. But if such trespass be committed under the direction of the master or owner, he is responsible for the same as if committed by himself. So by the act of January, 18th, 1843, the trespass of a slave or apprentice on the school lands, is made the act of the master.

These statutory provisions give color to the idea that masters are unqualifiedly liable for all trespasses committed by their slaves, though done wilfully and without the consent or knowledge of the master. But we must be content to take the general law to

be as settled the other way, and from an early period in our sister States, according to the decisions before referred to. Though not satisfactory, it would be unsafe to depart from them. By the civil law, the master is answerable for all the damages occasioned by an offence or *quasi* offence committed by his slave, but if done without his order, he may exonerate himself by surrendering the slave to be sold. (*Gurrier vs. Lambeth*, 9 *Louisiana Rep.* 339.) As laid down in the Institutes, (*Coop. Justinian* 355,) " It is reasonably permitted to the master to deliver up the offending slave, for it would be unjust to make the master liable beyond the body of the slave himself." But our statute prescribes no such reasonable limitation to the responsibility of the master, who would thereby be prompted to vigilance, without being exposed to utter ruin by the misconduct of his slaves. We consider that the statutory enactments in this State are modifications of the general law, and, therefore, the master's liability for acts of his slaves in which he did not participate, must be restricted to those trespasses which are indictable offences, or not being so, are specified in the statute. The case of *Jenning vs. Kavanaugh*, 5 *Missouri* 26, and that of *Ewing vs. Thompson*, 13 *Ib.*, are direct authorities for such construction. The common law being inapplicable to domestic slavery, the idea is to be repudiated that the master's liability is to depend, as for injuries done by his beasts, upon his knowledge of the vicious propensities of his slave, and the consequent negligence of permitting him to go at large. The common law doctrine relating to master and servant, though equally inapplicable, having been adopted, any extension of the master's liability is the creature of the statute. In any future expression of the legislative will, it will be for that department to consider, whether the true interests of slave-holders would not be promoted by making them liable for all trespass committed by their slaves, thus removing many causes of jealousy and ill-feeling against the owners of that species of property, and at the same time protect them by limiting their liability, as at the civil law, to the value of the offending slaves.

The act of the defendant's slave, as charged in the declaration, not being one of those trespasses enumerated in the statute, for which the master could be made liable, whether in form of trespass or case, the judgment of the Court below is affirmed.